WEST v. EDWARD RUTLEDGE TIMBER CO. et al.

(District Court, D. Idaho, N. D. July 22, 1913.)

1. PUBLIC LANDS (§ 106*)—DECISIONS OF LAND OFFICE—REVIEW BY COURTS.

In the absence of fraud or gross mistake, decisions of the officers of the Land Department, made within the scope of their authority upon questions of fact, or where questions of law and of fact are inseparably commingled, cannot be reviewed by the courts; but if by manifest mistake of law these officers deprive a man of his rights a court of equity will grant appropriate relief.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 104, 301, 302; Dec. Dig. § 106.*]

2. PUBLIC LANDS (§ 35*)—HOMESTEAD—QUALIFICATION OF ENTRYMAN.

If a settler is qualified when he takes up his residence and files on public land which is subject to homestead entry, he is not disqualified from making final proof because he afterwards acquires and holds more than 160 acres of other land.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 72–77; Dec. Dig. § 35.*]

3. PUBLIC LANDS (§ 35*)—HOMESTEAD ENTRIES—GOOD FAITH OF ENTRYMAN.

That land sought to be entered as a homestead by a settler is covered with valuable timber, and that its value for agricultural purposes may be questionable, where it is, however, tillable when cleared and reasonably productive, does not warrant the inference that the application was not filed in good faith for the purpose of acquiring a home.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 72–77; Dec. Dig. § 35.*]

4. PUBLIC LANDS (§ 81*)—GRANT IN EXCHANGE FOR PARK LANDS—ASSIGNABILITY.

By Act March 2, 1899, c. 377, 30 Stat. 993, creating Mt. Rainier National Park, it was provided that on conveyance by the Northern Pacific Railroad Company to the United States of its lands lying within the limits of the proposed park that company should be authorized to select in lieu thereof an equal quantity of nonmineral public lands elsewhere. At that time the Northern Pacific Railroad Company owned no lands, the same having passed through foreclosure sale to the Northern Pacific Railway Company. The latter company accepted the proposed exchange, conveyed its lands within the park to the United States, and selected other lands in lieu thereof, for which it received patents; the Interior Department expressly finding that the railway company was the lawful successor in interest of the railroad company. Held that, in view of such ruling and of the fact that otherwise the provision of the act would be wholly ineffective, the railway company must be deemed to have succeeded by assignment to the rights of the railroad company thereunder and its patents sustained.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 250–252; Dec. Dig. § 81.*]

5. PUBLIC LANDS (§ 29*)—SURVEYS—CLASSIFICATION OF MINERAL AND NONMINERAL LANDS.

The act having limited the right of selection of lieu lands to "nonmineral public lands so classified as nonmineral at the time of actual government survey which has been or shall be made," a selection of land in fact nonmineral is not invalidated by the fact that the surveyors did not expressly classify it as such; it being the practice of the Department to re-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

quire notation of evidences of mineral deposits and to treat all lands as to which no notation is made as nonmineral.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 41–47; Dec. Dig. § 29.*]

6. PUBLIC LANDS (§ 82*)—SELECTION OF LANDS GRANTED—DESCRIPTION OF UNSURVEYED LAND.

Where a grant of public lands to be selected by the grantee provided that in case the land selected should be at the time unsurveyed the list filed "should describe such tract in such manner as to designate the same with a reasonable degree of certainty" in the absence of any rule of the Land Department, and where an adjoining township had been officially surveyed, a description of the land by the legal subdivision by which it would be designated when surveyed in accordance with the established system of surveys was sufficient.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 236, 253–256; Dec. Dig. § 82.*]

7. PUBLIC LANDS (§ 81*)—GRANTS IN EXCHANGE FOR OTHER LANDS—CONSTRUCTION.

The rule that public grants are to be construed strictly against the grantee is not applicable to a grant of public lands in exchange for other lands conveyed to the United States, where the question is not one of the extent of the grant but of procedure in administration of the act.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 250–252; Dec. Dig. § 81.*]

In Equity. Suit by Andrew West against the Edward Rutledge Timber Company and the Northern Pacific Railway Company. Decree for defendants.

A. H. Kenyon and Merritt, Oswald & Merritt, all of Spokane, Wash., for plaintiff.

James B. Kerr, of Portland, Or., Stiles W. Burr, of St. Paul, Minn., E. J. Cannon, of Spokane, Wash., and Davis, Kellogg & Severance, of St. Paul, Minn., for defendants.

DIETRICH, District Judge. The plaintiff is seeking to compel the defendants to convey to him the title to the S. E. ¼ of section 20, in township 44 north of range 3 east of Boise meridian, timbered land in North Idaho. His theory is that, being a settler upon the tract at the time it was surveyed, and qualified to enter the same under the homestead laws of the United States, he was by the Interior Department unlawfully and without fault upon his part denied the right to make entry and procure patent thereto, and that, patent having been issued to the defendant railway company through a misapprehension of the law, it took the title in trust for him. The defendant timber company is the grantee of the railway company. The general rules and conditions under which courts of equity exercise jurisdiction in such cases are well understood, and do not require extended discussion.

[1] In the absence of fraud or gross mistake, decisions of the officers of the Land Department made within the scope of their authority upon questions of fact, or where questions of law and of fact are inseparably commingled, cannot be reviewed by the courts. But if by manifest mistake of law these officers deprive a man of his right, a

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

court of equity will grant appropriate relief. Marquez v. Frisbie, 101 U. S. 473, 25 L. Ed. 800; Moore v. Robbins, 96 U. S. 530, 24 L. Ed. 848; Johnson v. Towsley, 13 Wall. 72, 20 L. Ed. 485; Bishop of Nesqually v. Gibbon, 158 U. S. 156, 15 Sup. Ct. 779, 39 L. Ed. 931; Johnson v. Drew, 171 U. S. 94, 18 Sup. Ct. 800, 43 L. Ed. 88. Where, as here, the plaintiff is a private individual, he must establish his personal qualifications and his right to receive the title in controversy, for, however erroneous the ruling of the Land Department, a private individual cannot be heard to challenge it unless he has been wronged thereby; the government alone can appear in behalf of the public interest.

[2] The first inquiry, therefore, is whether at the time he offered his filing the plaintiff was qualified to enter public land as a homestead, and whether in due time he substantially complied or tendered compliance with the requirements of the law. The only suggestion of a personal disqualification on the part of the plaintiff is that, not at the time he offered to file upon the land, but subsequently, after he had resided thereon for a considerable period of time, he acquired and held title to more than 160 acres. But it is thought that if a settler is qualified when he takes up his residence and files upon land which is subject to entry, it is immaterial that he thereafter acquires and holds title to more than 160 acres. Clark v. Mansfield, 24 Land Dec. Dept. Int. 343; Smith v. Longpre, 32 Land Dec. Dept. Int. 226; Mathison v. Colquhoun, 36 Land Dec. Dept. Int. 82. See, also, Ard v. Brandon, 156 U. S. 537, 15 Sup. Ct. 406, 39 L. Ed. 524.

As to settlement and improvement, evidence was adduced tending to show that the plaintiff paid a small consideration to a former occupant of the land for his improvements and his prior right of possession, and thereupon took up his residence thereon in May, 1903; and that he has maintained his home there ever since that date; and that he has added to the improvements and cleared and cultivated a small tract. In due form he applied to make homestead entry on July 17, 1905, shortly after the official survey was approved, but because of the supposed superior rights of the railway company his application was rejected. Substantially no evidence was offered by the defendants in rebuttal. While the amount cleared and brought under cultivation from year to year is pathetically small, I am inclined to the view that, assuming the defendants to be without right, the plaintiff would be entitled to make final proof and receive patent. It has long been the policy of the government to deal liberally with those who settle in good faith upon the public domain. Ard v. Brandon, 156 U. S. 537, 15 Sup. Ct. 406, 39 L. Ed. 524. In view of the controversy over the title, the refusal of the Land Department to recognize him as having any right, and the prolonged contest proceedings, it was not to be expected that the plaintiff would apply himself to the reclamation of the land with the courage and energy which would be reasonable under other circumstances. Moreover, the land is covered by a heavy growth of timber, which, because of the present want of transportation facilities, is not marketable, and therefore in clearing under the conditions which have prevailed, it has been necessary to destroy by fire timber products the proceeds of which, with a reasonable market, would, in a large

part, if not wholly, defray the expenses of reclamation. It is a policy of doubtful wisdom, to say the least, which would require the entryman vigorously to pursue a course attended with such great waste.

[3] The defendants urge that, in view of the inaccessibility of the land, its elevation above the sea level, the climatic conditions, the outlay required to remove the stumps and brush, and the great value of the timber, it is incredible that plaintiff has ever intended in good faith to make it his home, and that, upon the other hand, it must be inferred or presumed that he seeks title only that he may profit from the value of the timber. While I recognize that the possibilities of fraud in entering such lands under the homestead laws are great, I am unable to see how place can be given to this argument without indulging the conclusive presumption that ordinarily lands covered with a heavy growth of valuable timber are not enterable under the homestead laws—a view which would seem to be contrary to both the letter of the law and the practical construction placed thereon by the Land Department. The evidence abundantly shows that, if cleared, the land is tillable and reasonably productive. The winters are rigorous, but not more so than in many places where it is well known agricultural pursuits are carried on with entire success. So far as appears, transportation facilities will be provided here, as they have been elsewhere, in due course of time. Moreover, in adjudging the good faith of the average entryman it would be a mistake to assume that he exercises the same conservative judgment that we look for in the capable and experienced man of business. The financial wisdom of the homeless, land-hungry laboring man may be sheer folly to the successful captain of industry, and in rightly discerning the motives of either we must stand with him and feel the forces by which he, and not another, is moved. While it must be admitted that the argument for the defendants is not without cogency, in the absence of conduct upon the part of the plaintiff inconsistent with the theory of and tending to impeach his good faith, I do not feel justified in holding that, merely because there may be grave doubt whether the land, when divested of the timber, should, in the exercise of sound business judgment, be regarded as desirable for agricultural purposes, he has acted in bad faith and has had no purpose to till the soil, but seeks the title only in order that he may thereby secure the valuable growth of timber. While the question is not free from doubt, upon the whole I am inclined to the view that, had the claim of the defendants not intervened, the Land Department would have accepted plaintiff's proof and issued patent.

Now as to the right and title of the defendants: Briefly stated, the claim of the railway company is that, while the lands in question were unreserved public lands of the United States, and prior to the inception of any right on the part of the plaintiff, on June 21, 1901, it, as the successor in interest of the Northern Pacific Railroad Company, made selection thereof under the provisions of an act of Congress entitled "An act to set aside a portion of certain lands in the state of Washington, now known as the Pacific Forest Reserve, as a public park, to be known as the Mount Rainier National Park," approved March 2, 1899 (chapter 377, 30 Stat. L. 993), by filing in the United

States Land Office at Cœur d'Alene, Idaho, a proper application and selection list covering this tract, together with others. The description in this list, in so far as it is pertinent here, is as follows: Land which when surveyed will be described as follows: All of section 20, township 44, range 3, in the Cœur d'Alene land district, in the state of Idaho. Conceding that such a selection list was filed upon the date mentioned, and that at that time the land was unsurveyed, nonmineral public land, the plaintiff contends that such filing was ineffective to withdraw the land from entry, for reasons which we proceed to consider.

[4] The first objection is that, the grant being to the Northern Pacific Rail*road* Company, and the Rail*way* Company not being named in the granting act, the latter was not qualified to select the land or to receive a patent therefor. This is one of the questions which it was necessary for the Interior Department to decide and which it did decide. The patent contains an express recital to the effect that upon evidence adduced it was found that the railway company was "the lawful successor in interest" of the Railroad Company. In its administration of the public land laws, it is undoubtedly within the jurisdiction of the Interior Department to pass upon questions of succession, and in so far as such determination involves issues of fact, or issues of mixed law and fact, within the familiar principle already adverted to it is final and conclusive. But it is said that, contrary to the patent recital, the record shows that there was no evidence upon the point before the Department. Granting that we have before us a transcript of all the proceedings taken in the matter of the plaintiff's application to enter and receive a patent, we cannot assume that we have the entire record in the matter of the railway company's application for patent upon its lieu selections, and the presumption must therefore be indulged that the recital is true, in point of fact. It is, however, argued that as a matter of law it should be held that the railway company could not be an assignee under, or otherwise profit by, the act, for the grant is to the railroad company, and is not assignable. No decision is cited in support of the proposition, nor does plaintiff assign any reason, and apparently none is imaginable, why Congress should have intended to deny the right of assignment, or to confine the operation of the grant to the railroad company to the exclusion of its successors in interest. The grant was in no sense a gratuity. The government contemplated the creation of the Mt. Rainier National Park, and to carry out the purpose it was deemed desirable, if not absolutely necessary, to procure title to certain lands embraced in the land grant made to the railroad company by the Act of July 2, 1864, c. 217, 13 Stat. 365. For these it was willing to exchange other lands, which it owned, and by the act it proposed to make such exchange. The case is very different from one where the government is promoting a public enterprise by the donation of lands of great value, in which case it may not unreasonably be concerned in the character of the donee, and its qualifications and capacity to carry the enterprise to success. Here, upon the other hand, it was in need of certain privately owned lands, to carry out its own purposes, and in securing title thereto surely it was not greatly con-

cerned in the question to whom the consideration should be paid or what was done with it after it was paid.

In the light of conditions as they actually existed, and the manifest purpose of Congress to extinguish all private claims to the base lands required for the proposed park, we can do little more than speculate as to the reason why the railroad company rather than the railway company was named as grantee. It is unreasonable to infer that Congress intended thus to place itself upon record as opposed to the view that the railway company had succeeded to the property rights and franchises of the railroad company, for but a short time prior thereto, by a proviso in the Act of July 1, 1898 (chapter 546, 30 Stat. 621, 6 Fed. Stat. Ann. 457), it had expressly disclaimed any purpose to decide or prejudice this question, which was recognized as being of judicial rather than legislative cognizance. At the present time, the question appears to have been the subject of investigation, and it has been repeatedly held that, as a result of foreclosure proceedings consummated prior to the passage of the act of 1899, the railway company acquired all the property rights and franchises of the railroad company. 21 Ops. Atty. Gen. 486; 25 Ops. Atty. Gen. 401; Ferguson v. Northern Pacific Ry. Co., 33 Land Dec. Dept. Int. 634. See, also, Northern Pacific Ry. Co. v. United States, 176 Fed. 706, 101 C. C. A. 117; Northern Pacific Ry. Co. v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931.

It therefore seems that the construction contended for by the plaintiff would render the act nugatory, for if this conclusion is correct, and admittedly it is not open to review upon the record here, it turns out that at the time the act of 1899 was passed the railroad company was not possessed of the lands desired by the government, but that its rights thereto had passed to the railway company, and unless we hold either that by inadvertence the rail*road* company was named while the rail*way* company was intended, or that the privilege conferred upon the railroad company is assignable, plainly the act becomes wholly ineffectual for any purpose. It is a cardinal principle that of two possible constructions of a statute that one should be adopted which will give to it effect, in preference to that which would defeat the legislative intent. M., K. & T. Ry. Co. v. Kansas Pacific Ry. Co., 97 U. S. 491, 497, 24 L. Ed. 1095. As a general rule of law, restraint upon the right of alienation is not favored, and such grants are assignable. Webster v. Luther, 163 U. S. 331, 16 Sup. Ct. 963, 41 L. Ed. 179; Beley v. Naphtaly, 169 U. S. 353, 18 Sup. Ct. 354, 42 L. Ed. 775. Accordingly it is held that the railway company could, as a matter of law, by assignment become the successor in interest of the railroad company to the rights and privileges conferred by the act of 1899, and, it having been found as a fact by the Department that it is such successor, the point must be ruled adversely to the plaintiff's contention.

[5] The next objection to the validity of the railway company's "selection" is based upon that provision of the act which limits the right of selection to "nonmineral public lands, so classified as nonmineral at the time of actual government survey, which has been or shall be made," etc. Precisely stated, it is that the land was not expressly

classified as nonmineral by the surveyors in the field; it is not claimed that it was returned as mineral, nor is there now any question that it was in fact nonmineral. The determination of the relation which it was contemplated by Congress the surveyor's return touching the mineral character of the land should sustain to the right of selection is not free from difficulties, but doubtless the actual character of the land rather than the report thereof was the dominating consideration. Northern Pacific Ry. Co. v. United States, 176 Fed. 706, 101 C. C. A. 117. Clearly a selection, valid for certain limited purposes at least, may be made of lands not yet classified as nonmineral, for the right of selection extends to unsurveyed lands, which, in the very nature of things, cannot be so classified. The classification called for, being modal, and therefore incidental rather than substantial, and the land in question being nonmineral in fact, it may be seriously questioned whether the plaintiff should, without showing consequent prejudice or injury to himself, be permitted to take advantage of the neglect of the administrative officers to require, in advance of the issuance of patent, a formal report of a fact about the existence of which there is no doubt. But assuming, without deciding, that under such circumstances relief may properly be granted, it must in the first place be held that the record here is insufficient to warrant a finding that the land was not returned as nonmineral; and in the second place, assuming, as contended by the plaintiff, that the return of survey contains no express classification, I am inclined to the view that, under the practice prevailing in the Land Department, the absence of a classification as "mineral" is equivalent to, and is to be understood as a classification of nonmineral.

Undoubtedly the required report from the surveyors in the field was intended for the information of the officers of the Land Department, to the end that they might act intelligently and promptly in approving or rejecting applications for patents upon lands selected by the grantee. It is quite unimportant, therefore, in what manner or by what system the facts are reported from the field, provided the communication is understood in the Land Department. If, when a surveyor is sent out, he is instructed to note in his return all lands found to be of a mineral character as "mineral" and to make no notation at all touching lands found to be nonmineral, it cannot be said that a return made strictly in compliance with such instructions, designating some lands as mineral, and containing no notation at all as to others, fails to classify the latter group as nonmineral. The silence of the return in the one case is quite as significant as the express notation in the other. Now while it is not shown that any special instructions to this effect were given to the surveyors in this case, it does appear that there is a well recognized custom governing the return of surveys, equivalent to such an instruction.

"It is the uniform custom in surveying public lands to make in the field notes and surveyor's return notation of mines, outcroppings, and evidences of valuable mineral deposits where found, and to say nothing upon the subject of minerals where no mines, outcroppings, or evidences of valuable mineral deposits are found. When, therefore, the field notes and surveyor's return make no notation whatever of minerals in the land being surveyed, such lands are considered and treated as given a nonmineral classification by the surveyor." Davenport v. N. P. Ry. Co., 32 Land Dec. Dept. Int. 28.

See, also, Bedal v. St. Paul, etc., Ry. Co., 29 Land Dec. Dept. Int. 254; State of Idaho v. N. P. Ry. Co., 37 Land Dec. Dept. Int. 135; In re St. Paul, M. & M. Ry. Co., 34 Land Dec. Dept. Int. 211; In re N. P. Ry. Co., 40 Land Dec. Dept. Int. 64.

Accordingly, assuming the facts to be as stated by plaintiff's counsel, I must hold that the land was classified as nonmineral at the time of the survey.

[6] The remaining contention of the plaintiff is that the selection list filed in the local land office by the railway company on June 21, 1901, was ineffectual because of an insufficient description of the land. The pertinent provision of the act is:

"In case the tract so selected shall at the time of selection be unsurveyed, the list filed by the company in the local land office shall describe such tract in such manner as to designate the same with a reasonable degree of certainty."

It will be remembered that the description employed by the railway company was "land which when surveyed will be described as follows," and there follows a correct numbering of the section, township, and range. The real question therefore is whether, under any circumstances, a description of unsurveyed land by reference to the technical numbers which it will bear when surveyed designates it with "a reasonable degree of certainty." In general practice such a description is not uncommonly used, and, were .the plaintiff's position not fortified by the opinion of Acting Secretary Adams in the Hyde Case, 40 Land Dec. Dept. Int. 284, I would be inclined to the view that it has little support either in reason or the reported decisions, and, with all due respect, I am unable either to follow the reasoning or to concur in the conclusion of that case. It is true unsurveyed land may never in fact be surveyed, and it is also true that the government may in the future adopt a system of surveys radically different from that now in vogue. But these considerations are aside from the point. The description before us is universally understood as being equivalent to a statement that if, under the present system of public surveys, the lines thereof were actually extended, it would appear that this land is the S. E. ¼ ·of section 20, in township 44 north, range 3 east of Boise meridian. So far as concerns the certainty of the description, therefore, it is quite unimportant whether the land is ever surveyed or not, or whether the government retains or abandons its present system of surveys. Assuming that there are in the immediate vicinity other lands to which the public survey has already been extended, a reasonably intelligent surveyor could, with the data furnished by such a description, go into the field and identify the designated tract, and with precision define its boundaries upon the ground. The description is in effect a description by metes and bounds, with a tie to a fixed monument. To find and identify the land the surveyor selected for such purpose would, in compliance with certain familiar rules governing the making of public surveys, start from an established monument in an adjacent survey already officially approved, and, in accordance with such rules, would run certain courses and distances to reach a certain corner of the designated tract, the boundaries of which could thereupon be run out and

defined upon the ground. An amplified description tying the land to such monument and giving in detail the courses and distances and the metes and bounds would have no greater precision than the one we are considering.

True, there may be some slight variation in public surveys, but that is a contingency which cannot be wholly obviated. All paper descriptions are in their application subject to a degree of uncertainty. Not infrequently doubt arises in the actual location of the lines called for by an official survey. Moreover, when it comes to patent it is necessary to conform the boundaries of the claim to the official survey, and surely, in adjusting to the official survey, boundary lines located upon the ground pursuant to such a description as we have here, less difficulty would be encountered than in adjusting those located without reference to the official survey and where the tie is to some natural object arbitrarily chosen. Indeed, it is a matter of common knowledge that settlers upon unsurveyed land as a rule endeavor as best they can do to conform their boundaries approximately to the projected lines of an adjacent official survey. There is an apparent assumption upon the part of the plaintiff that it was the duty of the railway company in some manner to mark the boundaries of its claim upon the ground; but no such duty is imposed by the act, either expressly or by reasonable implication. The requirement is that the "list" "shall describe" the land with "a reasonable degree of certainty." If to give notice of the claim it were necessary to mark the boundaries, an entirely different question would be presented. But evidently it was thought by Congress that when an application was filed in the local land office containing a reasonably definite description it would constitute notice to all the world of the pendency of the claim and the status of the land included therein. I am not to be understood as holding that in all cases the description employed by the railway company would be reasonably certain; in any given case the degree of certainty of such description depends largely upon the degree of adjacency of surveyed land. Here the official survey had extended to adjacent townships, and I am wholly unable to understand how a list containing a detailed description by metes and bounds would have any more clearly advised the plaintiff of the exact location of the land than did the list under consideration. But however that may be in this particular instance, it is apparent that unless the view be adopted that, as a matter of law, under no conditions can a description by reference to the lines of the official survey be held to be in compliance with the act, the question of the sufficiency of the description is in every case one of fact, and hence not subject to review by the courts; and I am wholly unable to assent to the proposition that such a description can under no circumstances be held to be reasonably certain.

By the plaintiff much significance is attached to the clause in the latter part of the act, which provides that:

"In case such tract (of unsurveyed land) as originally selected and described the list filed in the local land office shall not precisely conform with the lines of the official survey, the said company shall be permitted to describe such tract anew, so as to secure such conformity."

It is urged that such a method as was followed here admits of no variation or discrepancy requiring adjustment. The argument rests wholly upon the assumption that, if the method is authorized at all, it is exclusive; but such an assumption is plainly unwarranted. The act does not purport to require any given form of description, but upon the other hand gives the widest latitude. Its only requirement is that in the selection list the lands shall be designated with a "reasonable degree of certainty." The method of designation is immaterial provided it identifies the land. It was doubtless anticipated that different methods would be employed, and the provision above quoted was intended to point out the course to be pursued in cases where the original description is not tied to the lines of an official survey, as here. In the act of 1898 (30 Stat. 620, 621) this method of identification had been expressly sanctioned—indeed, it had been prescribed to the exclusion of all others—and it is not reasonable to believe that if, a few months later, Congress had intended to outlaw it altogether, the communication of such intention would have been left to inference or implication. The better view is thought to be that it was intended not to limit the description to any specific form, but to authorize any method which would identify the land with reasonable certainty, leaving to the Land Department the discretion to adopt such rules and regulations as, in the light of experience, might appear to be desirable. It is not doubted that, under the general language of the act, it is competent for the Department, by standing rules, to prescribe such a description as was used by the railway company, or a description by metes and bounds, or both. Whether such authority extends to the requirement that the boundaries be marked upon the ground is another question, which need not be decided. But when the railway company filed its list there were no rules or regulations upon the subject, and, as was said by Acting Secretary Pierce, in Hanson v. Northern Pacific Ry. Co. (38 Land Dec. Dept. Int. 491), where the sufficiency of this identical list was under consideration:

"The practice of allowing selections by the railway company as these selections were made had been of such long standing and such uniform practice that it would be unfair, if not illegal, to give retroactive effect to such regulations"

—that is, such regulations as were promulgated by circular of November 3, 1909 (38 Land Dec. Dept. Int. 287), requiring a description by metes and bounds, and a posting of notice upon the land, as well as a reference to the projected lines of the official survey.

In adopting such rules and at the same time sustaining prior selection lists not in compliance therewith, the Department was not necessarily acting inconsistently. The act does not require a perfect or the best possible description, but only one having a reasonable degree of certainty. It does not follow that one form of designation is wanting in a reasonable degree of certainty because, in the light of experience, another is adopted which for the time being is thought to be a better. Otherwise the future promulgation of still more stringent regulations would operate to invalidate selections made in strict compliance with

the rules now in force. The true view is thought to be that, within the range of sound discretion, the Land Department is clothed with the authority to determine as a question of fact whether, under the circumstances of the case, any given designation is reasonably certain, and when fairly made within such limits such determination should not be disturbed, even though the courts may be of the opinion that greater precision is both desirable and practicable. My conclusion is that it cannot be held that, as a matter of law, such form of description as was here employed is, under any and all conditions, insufficient to designate the land with a reasonable degree of certainty, and as a question of fact there is no showing warranting a finding that, under the circumstances of this case, the Department either acted fraudulently or abused its discretion in holding the designation to be sufficient.

[7] Much stress is laid upon the familiar rule that public grants are construed strictly against the grantee. In applying this rule, however, some consideration should be given to the fact that the grant here was not a mere gratuity, but that the act is in the nature of an offer upon the part of the government of an exchange of lands presumably beneficial to it. Besides, the question in controversy relates, not to the extent of the grant, but only to procedure in the administration of the act, a subject which is left largely to regulation by the Land Department. As was said by Assistant Secretary Pierce in State of Idaho v. Northern Pacific Ry. Co., 37 Land Dec. Dept. Int. 135, 138:

"It was deemed necessary to the accomplishment of its purpose that the United States should own the land placed in reservation by the act (original land-grant act). A voluntary conveyance by the railway company was the most feasible method of reacquiring title to the granted land, and a right of exchange upon the terms and conditions set forth was the consideration offered to induce the company to transfer its title. An offer is made by one party of which acceptance by the other is invited. The act is contractual in character, and terms and conditions not clearly expressed are not to be lightly imposed after acceptance of the offer."

But laying aside these considerations, and applying the rule with all possible rigor, how can we construe the act so as to exclude, as a matter of law, descriptions by reference to the official survey? Clearly no such inhibition is expressed, and if implied at all it must be found in the requirement that the land be designated "with a reasonable degree of certainty." But, as we have already seen, within certain limits what is a reasonable degree of certainty in any given case is a question, not of law, but of fact.

In conclusion it is to be noted that the railway company pursued a course which, if not at the time expressly prescribed by, received the later approval of, and all the time had the apparent sanction of usage in, the Land Department. The plaintiff was neither misled nor prejudiced thereby, for seemingly he had no knowledge of the existence of the list, and therefore, whatever may have been the form of the description, it could not have influenced his action. The claims of a pioneer settler always appeal strongly for sympathy, but upon the most earnest consideration I am unable to grant the relief prayed for and at the same time preserve the integrity of what I understand to be the law.

From what has been said, it necessarily follows that the bill must be dismissed, and such will be the decree; each party is to pay his own costs. The attorneys for the defendants may prepare form of decree.